| | |
|---|---|
| **HANNAH BLOSSER, individually and on behalf of all others similarly situated,** | **Case No.** |
| **Plaintiff,** | |
| **v.** | **CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| **REALPAGE, INC.;** **THOMA BRAVO L.P.;** **AVENUE5 RESIDENTIAL LLC;** **BH MANAGEMENT SERVICES, LLC;** **ALLIANCE RESIDENTIAL REALTY, LLC;** **ASSET LIVING, LLC;** **CAMDEN PROPERTY TRUST;** **CORTLAND PROPERTIES, INC;** **CUSHMAN & WAKEFIELD, INC.;** **GREYSTAR REAL ESTATE PARTNERS, LLC;** **HIGHMARK RESIDENTIAL, LLC;** **LINCOLN PROPERTY CO.;** **MID-AMERICA APARTMENT COMMUNITIES, INC.;** **MORGAN PROPERTIES, LLC;** **RPM LIVING LLC; and** **SECURITY PROPERTIES INC.** | |
| **Defendants.** | |

Plaintiff Hannah Blosser, individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to her and upon information and belief as to all other matters, brings this class action Complaint to recover treble damages, injunctive relief, and other relief as appropriate, based on violations of federal antitrust laws by the following Defendants: RealPage, Inc.; Thomo Bravo L.P.; Avenue5 Residential LLC;

1

BH Management Services, LLC; Alliance Residential Realty, LLC; Camden Property Trust; Cortland Partners, LLC; Cushman & Wakefield, Inc.; Greystar Real Estate Partners, LLC; Highmark Residential, LLC; Lincoln Property Co.; Mid-America Apartment Communities, Inc.; Morgan Properties LLC; RPM Living LLC; and Security Properties, Inc.

1.      This civil action arises from Defendants' conspiracy and actions in concert to fix, raise, maintain, and stabilize rental housing prices in the State of Tennessee, particularly in the metropolitan areas of Nashville, Memphis, Chattanooga, and Knoxville.

2.      Defendant RealPage, Inc. ("RealPage"), is the developer of a software platform called "AI Revenue Management" (previously called "YieldStar"). The other Defendants are several managers of large-scale residential apartment buildings that have used RealPage's software platform to coordinate, agree, and execute upon fixed market rental housing and apartment pricing, among other things, in the State of Tennessee. All Defendants have conspired to fix pricing in the rental and apartment residential markets.

3.      AI Revenue Management operates by collecting, storing, processing, and analyzing terabytes of non-public data from its customer client property managers regarding lease transactions, rent prices, occupancy levels, and other data points that drive or affect the price of home and apartment rental pricing. This data is used by RealPage's algorithm(s), along with additional data collected from Defendant RealPage's myriad of other data-analytics and rental-management software. RealPage's algorithm uses the gathered data to generate a rental price for each of RealPage's client's available units, pricing which is updated daily. RealPage ensures that the other Defendants know that to maximize revenues, they must accept the software's rental price at least 80%-90% of the time, and RealPage's "Revenue Management Advisors" monitor their compliance with the recommendations. RealPage and the Defendant property managers who use

2

RealPage's revenue management services constitute a price-fixing cartel, and the revenue growth they have achieved is possible only through carefully concerted price setting.

4.  With the assurance that their competitors set Tennessee rental prices using the same algorithm, each Defendant property manager can hold vacant a larger share of its units while maintaining higher rental prices across all properties. This RealPage strategy and process increased Defendants' revenue and profits at the expense of renters such as the Plaintiff.

5.  Defendants' strategy succeeded because of the pricing coordination among competing property managers enabled by themselves acting in concert. Knowing this, Defendant RealPage has stated that for its software to work properly, its customers must accept its suggested price at least 80% - 90% of the time.

6.  Before the introduction of coordinated rent-setting software, residential property managers generally set prices, independently, to maximize occupancy in a competitive market environment. Before using RealPage's software, management companies would not allow apartments to stand vacant in Tennessee at their advertised rental prices when similar apartments were available for less. In the past competitive market, Tennessee property managers had an incentive to lower rents until all or most available units were occupied. Allowing apartments to sit, unoccupied, would not be a profitable strategy but for some assurance or expectation that other companies' property managers also would allow their units to remain vacant without lowering rents. RealPage's software provides such an assurance and expectation, as well as the desired results.

7.  Beyond the anticompetitive exchange of non-public and competitively sensitive information among competing property managers, Defendant RealPage had used additional mechanisms to facilitate coordination among cartel members and prevent "cheating" by conspiracy

3

participants. By allowing property managers to outsource their rent-setting process, RealPage causes them to consider higher rent prices than they ever would have before. One executive at one of RealPage's clients stated: "The beauty of YieldStar is that it pushes you to go places that you wouldn't have gone if you weren't using it."

8.     Defendant RealPage polices cartel members by applying heavy pressure on them to accept the algorithm's suggested a majority of the time. The AI Revenue Management service includes more than its rent-setting algorithm. Clients can expect constant communication with one or more of RealPage's Revenue Management Advisors who provide "expert oversight of [clients'] pricing strategy."[1] Defendant property managers also can anticipate enforcement of these price-fixing strategies, as any client property manager who desires to diverge from the algorithm's set price is expected to provide justification to a RealPage Revenue Management Advisor.

9.     The RealPage scheme and software also recommends lease renewal dates for its clients' properties. Using Defendant RealPage's vast store of data on lease transactions, the algorithm suggests dates that are staggered to avoid temporary periods of oversupply resulting from the natural ebb and flow of the market.  The algorithm reduces the incentive for property managers to undercut or compete with perceived competitors, even during these temporary oversupply periods.

10.     Defendant RealPage facilitates direct information exchanges between competitors and provides opportunities for direct coordination of prices. It hosts online forums, organizes in-person events for its clients, and maintains standing committees of cartel members to advise on pricing strategy.

---

[1] *RealPage AI Revenue Management,* REALPAGE, INC., https://www.realpage.com/assetoptimization/revenue-management.

11.     As the property managers acknowledge, they are competitors.  Yet, RealPage's clients shared a common goal of increasing rent prices across the board and understood that RealPage – which has been explicit that its aim is to help its clients "outperform the market [by] 3% to 7%" – was the method to do it.   RealPage's clients include many of the largest property managers in the State of Tennessee, who control a majority of the rental units in desirable neighborhoods.  A recent analysis revealed that rents in areas where RealPage clients control a high percentage of rental units have increased at significantly higher rates than those where RealPage's influence is weaker.

12.     In the metro Nashville Tennessee area, both rents and vacancy rates had been trending higher from 2014-2020, demonstrating that the forces of supply and demand no longer control the price of rent.

13.     Defendants' price-fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the federal Sherman Act. The conspiracy has resulted in artificially inflated rent prices and a diminished supply of rental units in Tennessee, especially in larger metropolitan areas such as Nashville and Memphis.  Plaintiff, who rents in Nashville, and the Class, who rents across Tennessee, from property managers that use RealPage's software, paid significant overcharges on rent, suffering economic harm from the reduced availability of rental units they could reasonably afford.

## JURISDICTION and VENUE

14.     Plaintiff brings this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), to recover treble damages and the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws

5

of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

16. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all relevant times, one or more of the Defendants resided, transacted business, was found, are licensed to do business, and/or had agents in this District. Moreover, all or part of the acts complained of by the Plaintiff individually occurred in or were directed by Defendants at this District.

17. This Court has personal jurisdiction over each Defendant because, among other things, each Defendant: (a) transacted business throughout the United States, including in this District; (b) leased residential units to individuals throughout the United States, including in this District; and/or (c) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

18. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

19. No other forum would be more convenient for the parties and witnesses to litigate this case.

## THE PARTIES

20. Plaintiff Hannah Blosser is a resident of Nashville, Tennessee. Ms. Blosser rented a residential unit in a property known as Brentwood Oaks in Nashville, Tennessee from 2021 to

6

the present. During that time and upon information and belief Defendant Avenue5 Residential LLC managed the property using RealPage software. Consequently, Hannah Blosser paid higher rental prices by reason of the violations alleged herein.

21.     Defendant RealPage is a corporation headquartered in Richardson, Texas, organized and existing under the laws of Delaware. RealPage provides software and services to managers of residential rental apartments, including the YAI Revenue Management software described herein. RealPage was a public company from 2010 until December 2020, when it was purchased by Chicago-based private equity firm and Defendant Thoma Bravo. At that time, RealPage had over 30,000 clients or customers, including each of the ten largest multifamily property management companies in the U.S.

22.     Defendant Thoma Bravo L.P. is a Delaware limited partnership with offices in this district in San Francisco, California, as well as Chicago, Illinois and Miami, Florida. Thoma Bravo is a private equity firm with over $122 billion in assets. Thoma Bravo acquired RealPage in April 2021. On information and belief, Thoma Bravo was aware of RealPage's anticompetitive activities and acquired RealPage with the intent to maintain and enhance its cartel profits, which RealPage, with Thoma Bravo's active guidance and participation, has done. Plaintiff is informed and believes that Thoma Bravo is actively involved in the day-to-day operations of RealPage, including selecting and approving acquisition targets for RealPage, setting company policies, and hiring top RealPage executives from other Thoma Bravo companies, including CEO Dana Jones and COO Vinit Doshi, both of whom were recruited from Thoma Bravo subsidiary Sparta Systems.

23.     Defendant Avenue5 Residential LLC ("Avenue5") is a California limited liability company with its principal place of business in Seattle, Washington.

24.     Defendant BH Management Services, LLC ("BH") is a limited liability company

headquartered in Des Moines, IA, organized and existing under the laws of Iowa. BH manages over 100,000 apartments nationally, including approximately six properties in the Nashville metro area.

25.     Apartment Management Defendant Alliance Residential Realty, LLC is a Delaware limited liability corporation headquartered in Scottsdale, Arizona. Alliance manages more than 100,000 apartment units across the country. Alliance has been a RealPage client since at least 2003. Alliance is a RealPage client.

26.     Apartment Management Defendant Asset Living, LLC is an Arizona limited liability corporation headquartered in Houston, Texas. Asset Living manages more than 100,000 apartment units across the country. Asset Living is a RealPage client.

27.     Apartment Management Defendant Camden Property Trust is a Texas real estate trust headquartered in Houston, Texas. Camden is the twenty-ninth largest manager of multifamily rental real estate in the United States, with over 58,000 units under management. Camden is a RealPage client.

28.     Apartment Management Defendant Cortland Properties, Inc., is a Georgia limited liability company headquartered in Atlanta, Georgia. Cortland has over 85,000 units under management in 13 states. Cortland is a RealPage client.

29.     Defendant Cushman & Wakefield, Inc. ("Cushman & Wakefield") is a corporation headquartered in New York, NY, organized and existing under the laws of Delaware. Cushman & Wakefield is a residential apartment manager with approximately eleven properties in the Nashville metro area.

30.     Defendant Greystar Real Estate Partners, LLC ("Greystar") is a limited liability company headquartered in Charleston, South Carolina, organized and existing under the laws of

8

Delaware. Greystar is by far the largest manager of residential rental apartments in the country, with over 695,000 units under its management, including approximately 21 properties in the Nashville metro area.

31. Defendant Highmark Residential, LLC ("Highmark") is a limited liability company headquartered in Dallas, Texas, organized and existing under the laws of Delaware. Highmark is a residential apartment manager with approximately seven properties in the Nashville metro area.

32. Defendant Lincoln Property Company ("Lincoln") is a corporation headquartered in Dallas, Texas, organized and existing under the laws of Texas. Lincoln is a residential apartment manager with over 210,000 rental units under its management, including approximately 19 properties in the Nashville metro area.

33. Defendant Mid-America Apartment Communities, Inc. ("MAA") is a corporation headquartered in Germantown, Tennessee, organized and existing under the laws of Tennessee. MAA is a residential apartment manager with over 100,000 rental units under its management, including approximately twelve properties in the Nashville metro area.

34. Apartment Management Defendant Morgan Properties, LLC is a Pennsylvania limited liability company headquartered in King of Prussia, Pennsylvania. Morgan is the eleventh largest manager of multifamily rental real estate in the United States, with over 96,000 multifamily units under management in 20 states. Morgan is a RealPage client.

35. Apartment Management Defendant RPM Living LLC is a Texas limited liability company headquartered in Austin, Texas. RPM is the seventh largest manager of multifamily rental real estate in the United States, with over 112,000 units under management in 21 states. RPM is a RealPage client.

36. Apartment Management Defendant Security Properties Inc. is a Washington

9

corporation headquartered in Seattle, Washington. Security Properties has over 22,000 units under management in eighteen states. Security is a RealPage client.

37.     Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy.  The Defendants are jointly and severally liable for the acts of their co-conspirators notwithstanding being unnamed as defendants in this Complaint.

38.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.  Each of the Defendants named herein acted as the agent of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

39.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

40.     Before the introduction of software like YieldStar, competition in the rental housing market was driven by property managers' desire to keep occupancy levels in their buildings as high as possible and to keep turnover among their tenants down.  In addition to  lost rent revenue caused by letting apartments sit empty, the costs of owning and maintaining rental apartments are not significantly different whether the unit is occupied.  This provides a strong incentive for property managers to lower their rents to fill vacant units.  While property managers knew in theory that if they all resisted this temptation, they would all benefit from higher average rents, any individual property manager that lowered its rents to fill vacancies while the others did not would

10

be able to gain market share at the others' expense.

41.     Donald Davidoff, the principal developer of the competing price-setting software that Defendant RealPage acquired in 2017, Lease Rent Options, explained in a 2020 blog post:

> All [property managers] would be better off limiting their rent reductions; however, should one property manager lower their rents while the others don't, then that operator would outperform.  The result can be a race to the bottom that is not good for anyone, but the fear of missing out coupled with laws prohibiting collusion make this the most likely outcome. Donald Davidoff, *They're Heckling Revenue Management Again,* THE DEMAND SOLUTIONS BLOG (Aug. 18, 2020),https://www.d2demand.com/mfhblog/theyre-heckling-revenue-anagement-again.

This so-called "race to the bottom" might be bad for all property managers but is, of course,  good for renters.  It represents nothing beyond healthy price competition.

42.     Absent collusion, property managers could not unilaterally raise rents above market rates – any property manager that did so would lose tenants to its competitors who offered rental units at market rates, granting them a higher share of the available profits.  This dynamic causes rental prices in a competitive marketplace to be sensitive to changes in demand.  For example, rents have historically gone up quickly in neighborhoods that become trendy, or when new public transportation infrastructure is added, and have fallen in areas where businesses close, or that new generations find less desirable than previous ones did, or when new apartments are constructed and older ones fall out of favor.  Any number of factors that made people want to live in a certain area or a certain type of apartment could cause rents to rise or fall accordingly.  Rents were also historically responsive to changes in renters' average income.

43.     Defendants' conspiracy avoids a race to the bottom, but it does so at the financial expense of their customers – the renters.  It allows property managers to hike rents at a faster pace when demand is strong without needing to lower them when it is weak.  It eases natural competitive constraints and causes renters to spend higher and higher portions of their incomes on housing.

11

44. Defendant RealPage markets a "comprehensive platform of data analytics and on demand software solutions and services for the rental real estate industry." Its clients are managers of residential rental apartments, to which it offers an array of products for (a) marketing and leasing of apartments, (b) resident experience (including IT portals and rent payment software), (c) site management, (d) vendor and expense management, (e) budgeting and investment, (f) accounting, (g) data analytics, and (h) so-called "revenue management"–advisory services on how to obtain higher rents on every unit.

45. RealPage founded in 1998, acquired the original YieldStar software from Camden Property Trust ("Camden") in 2002. Two years later, the company hired Jeffrey Roper as its principal scientist to improve YieldStar's performance and grow its client base. RealPage began collecting information from its clients and other sources in a "data warehouse," which the algorithm could mine. Beyond rent prices and occupancy rates, this data included records of actual lease transactions, signed lease documents, lease renewal dates, records of rent payments, and detailed data on tenants and their finances.

46. Roper previously was involved in similar price-setting software for Alaska Airlines that facilitated information exchange and price-fixing, according to the U.S. Department of Justice.[2]

47. Much like the airlines' price-fixing cartel, Defendants' cartel avoids price wars and the "race to the bottom" during periods of oversupply. As Defendant RealPage declares to potential clients in its advertising materials: "You don't have to sacrifice rent growth during a softening market.

---

[2] Press Release, U.S. Dep't of Just., Justice Department Settles Airlines Price Fixing Suit, May Save Consumers Hundreds of Millions of Dollars (Mar. 17, 1994), https://www.justice.gov/archive/atr/public/press_releases/1994/211786.htm.

48.     Naturally, YieldStar's coordinated pricing strategy became more effective as more property managers implemented it. To this end, Defendant RealPage began buying up similar and competing software companies, and completed over 20 acquisitions as part of a rollup strategy.[3] The most important of these transactions came in 2017, when RealPage acquired Lease Rent Options ("LRO"), a company which offered a similar rent-setting software that was YieldStar's strongest rival. Instead of relying on nonpublic data from competitors, however, LRO's algorithm used only public market data as input. LRO's chief architect, Donald Davidoff, designed it that way specifically to avoid the potential antitrust violations arising from the use of nonpublic data to coordinate prices among competitors.

49.     The most valuable piece of the acquisition of LRO for Defendant RealPage was access to LRO's customer base was. RealPage doubled its pre-LRO buyout pricing of 1.5 million units. RealPage rebranded the product AI Revenue Management, and its client base and influence on rental markets in urban areas across the U.S. continued to grow. RealPage's website claims that its clients use AI Revenue Management to set the price for more than four million rental units.[4]

50.     According to RealPage's last annual report before being acquired by Thoma Bravo, as of December 31, 2020, its "client base of over 31,700 clients used one or more of [its] integrated data analytics or on demand software solutions to help manage the operations of approximately 19.7 million rental real estate units."[5]

51.     Defendant RealPage's vast client base provides it with real-time data on every aspect of the rental housing market, including actual rent prices as opposed to advertised rents —

---

[3] Bloomberg Company Report, RealPage, Inc. (generated Nov. 1, 2022).
[4] *RealPage AI Revenue Management, REALPAGE, Inc.,* https:///www.realpage.com/assetoptimization/revenue-Management/ (last visited Nov. 1, 2022)
[5] *See* RealPage Inc., Annual Report (Form 10-K) at 6 (Mar. 1, 2021).

data which was previously unavailable to landlords. RealPage advertises that the algorithm "crunches **millions of transactions each night**, pinpointing price shifts for **every single unit** on the platform at any point in time."[6]

52.     By enabling property managers to outsource lease pricing decisions to the software, Defendant RealPage has transformed rental markets. Where lease prices were formerly set to maximize occupancy rates, increasing revenue on individual rental units has become the driving force. David Hannan, senior vice president at the Morgan Group, a Houston-based property manager, which grew revenue 5% above expectations when it implemented YieldStar, characterized the transformation like this: "My generation grew up worshipping the occupancy gods. We learned that if you were not 95 percent-plus occupied, the asset was failing. But that's not necessarily true anymore . . . [t]his totally turns the industry upside down."[7]

53.     Other traditional aims for a healthy rental property, such as low turnover rates, have also been abandoned. Ric Campo, the CEO of Camden, said his turnover rates increased around 15 percentage points in 2006 after implementing YieldStar. Despite that increase in turnover rates, Camden's overall same-property revenue grew over 7% in its first year using YieldStar. "What we found," Campo said, "was that driving our turnover rate up actually captured additional revenue." While Camden's turnover expenses increased by $2.5 million, revenue increased $12.5 million. According to Campo, "[T]he net effect of driving revenue and pushing people out was $10 million in income."

54.     Defendant RealPage provides its customers with real-time information about their

---

[6] *YieldStar Calculates the Right Rent Price at the Right Time,* REALPAGE VIDEOS, httsp://www.realpage.com/ Videos/yieldstar-measures-price-elasticity/ (last visited Nov. 1, 2022) (emphasis added).
[7] Joe Bousquin, *In the Back Office, Revenue Management Software is Causing a Revolution,* MULTIFAMILY EXECUTIVE (Apr. 20, 2009), https://www.multifamilyexecutive.com/technology/in-the-back-office-revenue-Management-software-is-causing-a-revolution-o (last visited on Dec. 8, 2022).

competitors sufficient to avoid oversupply of units caused by natural ebbs and flows in the market. The algorithm uses the occupancy data it collects to recommend lease renewal dates that are staggered to avoid any period of oversupply. Property managers can then hold units vacant for a period, while keeping rent prices inflated. This strategy of staggering of lease renewal dates smooths out natural fluctuations of supply and demand, which further reduces any incentive for Defendants and their coconspirators to undercut their inflated prices. This incentive is always the greatest in periods of oversupply, when falling revenues could be replaced by achieving full occupancy at reduced rents.

55. Property managers who use YieldStar/AI Revenue Management do so with the explicit and common goal of increasing rents for all members of the cartel by using coordinated algorithmic pricing. Defendant RealPage advertises that its customers "outperform the market by 2%-7% year over year,"[8] by switching from an "occupancy focus" to a "rent growth focus." RealPage's clients find its revenue management services particularly helpful because those services allow the property managers to "make sure we're limiting our supply when there isn't too much demand."[9] As one property manager described in a promotional video on RealPage's website, YieldStar takes on the burden of "implementing the increases in rents . . . it's running the lease expiration for us and we're not manually doing it which means we're increasing our revenue

---

[8] *Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield,* REALPAGE, INC. (2020), https://www.realpage.com/storage/files/pages/pdfs/2021/02/ai-revenue-management-lookbook-nov20.pdf.
[9] *RealPage Revenue Management Maximizes Market Opportunity,* REALPAGE VIDEO (Dec. 2, 2019), https://www.realpage.com/videos/revenue-management-maximizes-market-opportunity/ (interview with John Kirchmann, CFO of IRET Property Management).

for those units."[10]

56.     To join the cartel, property managers must agree to abide by certain conditions. They must provide Defendant RealPage with real-time access to detailed, nonpublic data regarding their residential leases.     They must agree to outsource daily pricing and ongoing revenue oversight to RealPage.  Importantly, they agree to rent their units at the algorithm's recommended price, even where it is higher than they would have previously considered.  While it is possible for property managers to reject the algorithm's suggested price for a given unit, RealPage uses multiple mechanisms to enforce what it refers to as pricing "discipline" or "courage."  The result is that property managers adopt at least 80% and as much as 90% of suggested rates.

57.     Defendant RealPage provides participating property managers with daily recommended rents for available rental units.  The property manager must either accept these rates or provide justification to a RealPage Revenue Management Advisor for their divergence from the recommended price.  And, according to a former RealPage executive, property managers only ever offered minimal pushback on the recommended rates.

58.     Unlike renters, Defendant RealPage's customers (the property managers) are fully aware when they sign up that the higher rents achieved by using the algorithm are the result of coordinated pricing among competing property managers.  Before the introduction of rent-setting software, markets for residential leases were characterized by a prisoner's dilemma.  While higher rents across the board would benefit all landlords, one self-interested landlord could outperform the rest by undercutting the price and achieving full occupancy.  Without assurances that competitors will refrain from undercutting rent prices, individual landlords are forced to price their

---

[10] *YieldStar TM Revenue Management Optimizes Rent Pricing,* REALPAGE VIDEOS (Sept. 10, 2019), https://www.realpage.com/videos/yieldstar-opimizes-rent-pricing/ (testimonial of Holly Casper, Vice President of Operations for RKW Residential).

units to maximize occupancy.

59.     By enforcing price discipline and setting rents that result in lower occupancy rates, Defendant RealPage provides assurances that all or most property managers using its software are doing the same thing – raising rents and accepting lower occupancy instead of lowering the price to fill units. In this way, RealPage enables property managers to overcome the prisoner's dilemma that prevented coordinated pricing in the historical market for residential rental apartments.

60.     Defendant RealPage's customers are property managers aware that the rent growth they achieve is based on real-time sharing of nonpublic lease transactions and pricing data. RealPage calls this information exchange "continuous optimization through connected intelligence" and brags that it is "[b]uilt on the market's largest real-time data set."[11] Coordinated algorithmic pricing allows property managers to, in RealPage's own words, "outsource daily pricing and ongoing revenue oversight" to RealPage, allowing RealPage to set prices for client property managers' properties "as if we [RealPage] own them ourselves." Put differently, the software allows the independent property managers to operate as if they were one company setting prices.

61.     Defendant RealPage's model works to increase revenue by raising rent prices while accepting lower occupancy levels. During a 2017 earnings call, then-CEO of RealPage, Steve Winn, offered as an example one large property company, managing over 40,000 units, which learned it could make more profit by operating at a lower occupancy level. Prior to adopting YieldStar, the company had targeted 97% or 98% occupancy rates in markets where it was a leader. After outsourcing rent prices to the algorithm, the company began targeting 3%-4% revenue

---

[11] *Introducing AI Revenue Management: Next-Generation Price Optimization That Unlocks Hidden Yield,* REALPAGE, INC. (2020), https://www.realpage.com/storage/files/pages/pdfs/2021/02/ai-revenue-management-lookbook-nov20.pdf.

growth while operating at a 95% occupancy rate.

62.    Defendant RealPage's software not only facilitates price hikes, but it also allows conspirators to maintain higher prices. RealPage claims that Defendant property managers and their co-conspirators were able to maintain rent prices 7% above the competitive market rate. Speaking at a RealPage webcast, America Melragon, a former VP of revenue management for Defendant IRT, discussed how property managers can stabilize rents by using RealPage's software. According to Melragon, "We've noticed . . . competitors that are manually pricing have already started to experience pretty significant swings in their effective price. . . . For us, really having that insight into our own individual supply and demand exposure has helped our price pretty much stay in line with where we anticipated it to be."[12]

63.    Defendants and their co-conspirators are aware that the higher revenues they obtain using Defendant RealPage's software are the result of increasing average rent prices in the neighborhoods they serve.

64.    Defendants' conspiracy allows property managers to hike rents even higher when demand is strong without needing to lower them when it is weak. It untethers rent prices from their natural constraints, forcing renters to spend more money than they would have in a competitive rental market.

65.    Specific to the State of Tennessee, Defendants and co-conspirators control thousands of apartment units, including in the most desirable neighborhoods. Yet, in the years preceding the COVID-19 pandemic, vacancies trended upwards.

66.    Despite rising vacancies, with the help of RealPage, Defendants were able to

---

[12] *IRT Gains Pricing Stability with RealPage Revenue Management,* RealPage Videos (June 17, 2020), https://www.realpage.com/videos/irt-gains-pricing-stability/.

continue to raise rents year over year over year, demonstrating the disconnect between supply and demand.

67.     Legal and economic antitrust scholars studying collusive behavior have identified certain "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[13] Each plus factor that is present constitutes a piece of circumstantial evidence supporting active collusion, as opposed to mere conscious parallelism. The factors that provide the most probative value and lead to a strong inference of explicit collusion are referred to as "super plus factors."

68.     Here, several plus and super plus factors support the plausible inference that Defendants are members of a *per se* unlawful price fixing cartel. These include: (a) Defendants' exchange of competitively sensitive information, (b) the presence of a price-verification scheme, (c) a motive to conspire, (d) opportunities and invitations to collude, (e) high barriers to entry, (f) high switching costs for renters, (g) high market concentration, (h) stability in the market shares of large residential apartment managers, and (i) maintenance of excess capacity during periods of rising prices. At least nine (9) plus factors are evident.

69.     First, the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private is a "super plus factor" that leads to a strong inference of active collusion.[14] Defendant RealPage requires client property managers to input data on actual rents paid and occupancy rates, along with detailed records of lease transactions. This data, which would normally be kept private, is fed into the algorithm which sets coordinated rents among competing

---

[13] William E. Kovacic, *Plus Factors and Agreements in Antitrust Law,* 110 MICH. L. REV. 393, (2011).
[14] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation,* 115 NW. UNIV. L. REV. 1581, 1608 (2021).

property managers. Importantly, individual property managers would be competitively disadvantaged by providing private data to other property managers unilaterally, and rational actors will only do so with the expectation that they will benefit from similar private information shared by its competitors.

70. Next, Defendant RealPage provides participating property managers with a price-verification scheme. As described above, RealPage pushes its clients to accept the algorithm's rent price at lease 80-90% of the time and clients cannot freely diverge from the algorithm's price. This type of price-verification makes little sense absent collusion.

71. Next, Defendant RealPage provides property managers with a motive to conspire by advertising its software and claiming it can increase revenue by 3% to 7%.[15]

72. Next, the YieldStar/AI Revenue Management software itself is an opportunity to coordinate prices that was previously unavailable, and Defendant RealPage's advertisements are naked invitations to collude. Additionally, RealPage hosts online forums and in-person conferences for property managers[16] and maintains standing committees of cartel members to advise on pricing strategy,[17] all of which provide opportunities for more direct collusion.

73. Next, the market for residential apartment rentals is highly concentrated.

74. Desirable neighborhoods in many major cities are dominated by large corporate property managers, which are increasingly controlled by even larger private equity firms.[18] For example, ProPublica found that in one popular Seattle neighborhood, 70% of the apartments were managed by just 10 property managers, all of which were using Defendant RealPage's pricing

---

[15] *Proven in any Market Cycle,* RealPage eBook, *supra* note 4, at 6.
[16] *RealWorld 2022: The Pursuit of Excellence,* REALPAGE, INC., https://www.realpage.com/realworld/.
[17] *User Group Overview,* REALPAGE, INC., https://www.realpage.com/user-group/overview/.
[18] Heather Vogell, *When Private Equity Becomes Your Landlord,* PROPUBLICA (Feb. 7, 2022), https://www.propublica.org/ article/when-private-equity-becomes-your-landlord.

software.

75. Next, multifamily residential building owners and operators face significant entry barriers. These include the high cost of acquiring property and establishing a property management infrastructure as well as ongoing costs of building maintenance and regulatory compliance. Even small multifamily rental properties cost millions of dollars to acquire. Larger properties run into the hundreds of millions of dollars to own and manage and take several years and significant experience to build or acquire. New entrants into the residential real estate leasing market thus are unlikely to discipline cartel pricing.

76. Next, there are significant switching costs that prevent effective price competition in rental markets. In other markets with low switching costs, consumers can stop purchasing a particular manufacturer's product when its prices are no longer competitive. Here, it is not a product, but vital shelter, a place to live. Rental contracts, however, are usually for a term of at least one year. Renters who break their lease during the rental term will likely face significant financial penalties for doing so. These penalties may include, among other things: the forfeiture of a security deposit (typically at least one month's rent), or the requirement that the renter to continue paying rent until the property is re-leased. Because of these high switching costs, renters cannot readily switch from one rental unit to another in the event their current rental unit no longer aligns with market prices. This creates a certain degree of natural market power for owners of rental properties and makes collusion more effective because even if a competing property manager were to offer lower prices on available units, customers will not typically break their leases to enter a lease for a lower cost property given the substantial cost of doing so.

77. Next, the relative market share held by the largest residential apartment managers has been remarkably stable. Since 2018, the list of the top 10 apartment managers in the country

21

has been virtually identical, with a total of 13 companies appearing on the combined list. The small variance is due largely to the merger between two of the top five apartment managers in 2020. Stability of relative market shares indicates a market that lacks dynamic competition.

78. The ninth identifiable plus factor is that Defendant RealPage's clients maintain excess capacity while simultaneously raising prices. The ability of RealPage's clients to increase their revenue depends on them continuing to raise rental prices while simultaneously maintaining a higher vacancy rate than they would have independently. This is evidence of collusion because in a competitive market, firms with surplus inventory normally reduce prices to grow market share. RealPage and its clients are open about how they can achieve higher revenues while maintaining a lower occupancy rate than they could setting prices independently.

## RELEVANT MARKET

79. The relevant product market is the market for the lease of multifamily residential real estate and the relevant geographic market is in and around the State of Tennessee, including the greater Nashville metro area, as well as other Tennessee metro areas such as Memphis, Chattanooga, and Knoxville.

80. Multifamily real estate leases in Tennessee and the greater Nashville metro area comprise a distinct product market and geographic area.

81. Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for multifamily rental apartment units because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing. Nor is single-family real estate considered an economic substitute for multifamily residential real estate. For example, single-family properties typically do not offer amenities and security.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action on behalf of herself individually and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages, as well as equitable and injunctive relief, on behalf of the following Class:

> All persons and entities who paid rent for a residential unit in the State of Tennessee owned, managed, or controlled by a Defendant using YieldStar, AI Revenue Management, or any other RealPage software from January 1, 2016 to the present.

83.     Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded from this Class are any federal, state, or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action.

84.     The Class is so numerous as to make joinder impracticable.  Plaintiff does not know the exact number of Class members because such information presently is in the exclusive control of Defendants.  Plaintiff believes that due to the nature of the residential rental market there are likely tens of thousands of Class members in the State of Tennessee.

85.     Common questions of law and fact exist as to all members of the Class.  Plaintiff and the Class were injured by the same unlawful price-fixing conspiracy, and Defendants' anticompetitive conduct was generally applicable to all the members of the Class, and relief to the Class as a whole is appropriate.  Common issues of fact and law include, but are not limited to the following:

A.     Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain or stabilize rent prices for residential units in the

State of Tennessee;

B.  The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

C.  Whether such combination or conspiracy violated the federal antitrust laws;

D.  Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the Plaintiff and other members of the Class;

E.  Whether Defendants caused Plaintiff and the Class to suffer damages in the form of overcharges on rent for residential units;

F.  The appropriate class-wide measure of damages; and

G.  The nature of appropriate injunctive relief to restore competition in the State of Tennessee residential apartment rental market.

86.  Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated rent for residential units managed cartel members.

87.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

88.  Plaintiff has retained counsel with experience litigating multi-district complex litigation and class actions in myriad industries and courts in the U.S.

89.  The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

90.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.  Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or  varying adjudications, establishing incompatible standards of conduct for Defendants.

91.     Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## ANTITRUST INJURY

92.     Defendants' anticompetitive conduct had the following effects, among others:

A.      Competition among Defendants has been restrained or eliminated with respect to residential rental units in the State of Tennessee;

B.      The price of residential rental units in the State of Tennessee has been fixed, stabilized, or maintained at artificially high levels; and

C.      Individuals have been deprived of free and open competition.

93.     Defendants' violations of the antitrust laws have caused Plaintiff and the Class to pay higher prices for residential rental units in the State of Tennessee than they would have in the absence of Defendants' illegal contract, combination, or conspiracy, and as a result, have suffered damages in the form of overcharges paid on their rental units.

25

94.     This is an injury of the type that the antitrust laws were meant to punish and prevent.

## FRAUDULENT CONCEALMENT

95.     Plaintiff and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. The uses and antitrust effects of RealPage's software and services were never disclosed to Plaintiff. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix residential rental unit prices in the State of Tennessee.

96.     The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, sharing non-public data via YieldStar/AI Revenue Management, secret meetings, surreptitious communications between Defendants by the use of telephone or in-person meetings at trade association meetings (and elsewhere) in order to prevent the existence of written records, limiting any explicit reference to competitor or supply restraint communications on documents, and concealing the existence and nature of their competitor supply restraint and price discussions from non-conspirators. The conspiracy was by its nature self-concealing.

97.     Throughout the Class Period set forth in this Complaint, Defendants and their co-conspirators effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and Class members.

98.     The residential rental market is not exempt from antitrust regulation. Plaintiff reasonably considered the residential rental market to be a competitive industry. Accordingly, a

26

reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' rental practices.

99.     Plaintiff exercised reasonable diligence.  Plaintiff and the members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their combination.

100.     By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other Class members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

**COUNT I**
**Price Fixing in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

101.     Plaintiff repeats the allegations set forth above as if fully set forth herein.

102.     Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2016 (further investigation and discovery may reveal an earlier date), and continuing through the present, Defendants and their co-conspirators entered and engaged in a contract,  combination, or conspiracy to unreasonably restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

103.     The contract, combination or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the rents they charge for residential units in the State of Tennessee and involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

27

104. Plaintiff and members of the Class have been injured and will continue to be injured in the form of overcharges on rent.

105. Defendants' anticompetitive conduct had the following effects, among others:

106. Competition among Defendants has been restrained or eliminated with respect to residential rental units in the State of Tennessee:

a. The price of residential rental units in the State of Tennessee has been fixed, stabilized, or maintained at artificially high levels; and

b. Individuals have been deprived of free and open competition.

107. This conduct is unlawful under the *per se* standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

108. Plaintiff and members of the Class are entitled to treble damages, attorneys' fees and costs, and an injunction against Defendants to end the ongoing violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the Class of all others so similarly situated, respectfully request that:

A. The Court determine that this action may be maintained as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and his counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

28

B. The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. §1);

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

E. The Court award Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

29

Dated: May 3, 2023                    Respectfully submitted for the PLAINTIFF,

_/s/ Thomas Roe Frazer III_
Thomas Roe Frazer III (TN BPR: 33296)
T. Roe Frazer II (TN BPR: 035785)
J. Grant LaBar (TN BPR: 040284)
FRAZER PLC
30 Burton Hills Blvd, Ste 450 Nashville,
TN 37215
Telephone: (615) 647-6464
roe@frazer.law
trey@frazer.law
grant@frazer.law
Steve Beal (TN BPR: 007297)
Lena Beal (TN BPR: 030068)
22 Monroe Ave
Lexington, TN 38351
(731)968-9077
(731)968-0782

**To be admitted _pro hac vice_:**

Archie C. Lamb, Jr.
Archie Lamb and Associates, LLC
101 E. Romana St. #211
Pensacola, FL 32502